# Richmond.

## APPERSON V. DOWDY.

### JANUARY 20th, 1887.

### Absent, LEWIS, P.

1. WILLS—*Lost will—Secondary evidence.*—After proof of loss of record of will, its contents may be established by parol and secondary evidence, such being the best proof the nature of the case admits of.
2. IDEM—*Case at bar.*—Ten years after destruction of record, effort to assail for first time a title and possession long enjoyed, is made by proceedings to set up lost will upon evidence of its contents, by witness then 85 years old testifying that 68 years before she had heard the will read, and stating the testamentary disposition of the testator's property—

HELD:

 The testimony, though admissible, is insufficient.

Appeal from decree of circuit court of Buckingham, rendered 23d October, 1884, upon a proceeding by petition· of Thomas F. Dowdy and Mary F., his wife, to establish the lost record of the will of Jacob Duncan, deceased, in accordance with Code 1873, chapter 172, sections 13 and 14. The circuit court confirmed the report of the special commissioner establishing the lost record of the will just as the same was set forth in the petition. The land which, under the will, came to the female petitioner at the death of the life-tenant, Peter Duncan, had been conveyed by him in 1862, seven years before the destruction of the record of the will, and seventeen years before the

filing of the petition, to S. G. Apperson, who had since then peaceably held possession thereof. From the decree Apperson appeal to this court.

Opinion states the case.

*R. T. Hubard*, for the appellant.

*Martin & Horsley*, for the appellees.

LACY, J., delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Buckingham county, Virginia, rendered at the October term, 1883, upon a proceeding to set up a lost will, before a special commissioner of the circuit court, appointed for the purpose of setting up lost records. In February, 1879, Dowdy and wife filed their petition before the special commissioner, to set up the will of one Jacob Duncan, alleging that he died leaving a will, which was probated and was destroyed by fire in February, 1869; that they desired to re-establish it; that they knew of no official copy of the same; that the appellant and one Gormus and wife were the only other persons interested in the matter. One witness was introduced. In 1880 her deposition was taken. Her testimony was that she was in her eighty-fifth year; that she was the daughter of the testator; that in 1812, *sixty-eight* years before, her father had died, being an infant, she had a guardian appointed to protect her interests under the will of her father; that she had at that time seen the will, and heard it read by a *Mr. Ford*, in the presence of her mother and a Mr. Ayres and Peter Duncan; that the contents were that a negro man was given to her; that the testator gave all the rest of his property to her mother for her life; at her death all the personal property was to be sold, and the

proceeds divided among his children; that his land was given by his will to his son, Peter Duncan, after her mother's death, to be held by said Peter Duncan during his life, and if the said Peter Duncan left any child or children after his death, then to such child or children, and if he died without any children, then the land was to go back to her father's estate.

It appears by a deed filed in the cause that the appellant was the purchaser of the land in question in 1862, from Peter Duncan, from whom he received a deed with general warranty. The petition was filed in 1879 ten years after the fire which destroyed the will.  The female appellee, Mary F., being left a child by Peter Duncan, coming to womanhood, married the male petitioner, Thomas F., and they brought this suit.  There was a decree setting up the will according to the foregoing statement of the witness called to establish it, when the appellant tendered his bill of review to correct alleged errors apparent against him, which was rejected by the court, and he appealed.

There are numerous assignments of error, which need not be reviewed here, in the view we take of the case.

The objection to the proceeding on account of the use of parol and secondary evidence cannot be sustained.  It calls in such only when the best evidence is wanting, and not attainable.  In a case where the best evidence is wanting—when a record is lost, upon which rights depend, when no copy is to be had—the legislature has provided this remedy, and in doing so no rule of law is violated or changed.  The best evidence is requisite, if such can be had, always; but that not being attainable, a resort to secondary evidence is essential, if the rights are to be preserved.  In times of war and pillage, when clerks' offices have been rifled by a public enemy, or clerks' offices, or other repositories of public records are destroyed by fire, all titles are rendered precarious, and a want common to all renders it necessary that such methods shall be resorted

to for the public good. Hence at a very early day in our history our legislature enacted laws to repair these ravages of war, and provided for the restoration of the records by the best evidence which could be produced, and of which the nature of the case will admit.

In *Smith* v. *Carter*, decided by this court in 1825 (3 Rand. 169), a long and continued possession was succesfully defended by parol proof of the contents of a will which had been probated, and afterwards destroyed by fire, during the war of the Revolution; the court saying that this was the best evidence which the nature of the case would admit of, that being a proceeding in ejectment; the court remarking, however: "Though parol proof of the contents of an instrument must be generally very defective (it being seldom possible, after a lapse of time that the witness can recollect the precise expressions in it, or their collocation, on which its meaning often depends)."

Mr. Greenleaf says: "If the record is lost, after proof of the loss, its contents may be proved like any other document, by any secondary evidence, when the case does not, from its nature, disclose the existence of other and better evidence. It must, however, be kept in view that while the best evidence the nature of the case will admit of is admissible, and so when no other is to be had, the evidence of the contents of a lost will, dependent upon the recollection of a witness, may be held to be admissible, but the weight of this sort of evidence is quite another question, wherein we must consider the means of knowledge of the witness, the power of recollection necessary, and the character of the question at issue."

For example, if perfect knowledge, a reasonable time, and a simple fact be the question, and the witness reasonably intelligent, the contents might be satisfactorily proved by the recoltion of the witness. Thus, an intelligent witness, called upon to prove the contents of a will recently read by the witness,

which devised a known tract of land to Peter Duncan, would not risk the miscarriage of justice. But in a case where a title and possession have been long enjoyed unchallenged, when such title is assailed *only after the destruction of the records*, by a witness who testifies to the contents of a paper she has never read, and of which she has never read an authenticated copy, and bases her knowledge upon having heard the will read by an indifferent person, sixty-eight years before, when she was an infant, and so testifies when she is an octogenarian, not to the devise to Peter Duncan simply, but as to the degree of estate so devised, and crowns the whole by making her (x) mark instead of signing her name, we may well hesitate before we disturb an old title and possession upon such evidence. In this case there are many difficulties in the question as to the weight of this evidence. In 1880 could any person be expected to retain a perfect or a safe recollection of the contents of a paper read in her hearing in 1812? But when this is claimed for a young girl, who heard the paper read by a neighbor, and never heard it again for so many years, we might admit that the neighbor read the will correctly (a fact which she cannot prove), and then that she heard correctly, and yet we may well question whether her recollection is correct.

The deed to the appellant was made by the father of the female appellee many years ago, and was probably soon after the birth of a child. In the deed the will of Jacob Duncan is recited, and for seventeen years the title of the appellant was never questioned, and, after the death of Peter Duncan, nothing was heard of this claim about the degree of his estate until the will itself had been destroyed. This title and possession in the appellant should be disturbed only upon preponderating proof, whereas it appears that the testimony of the witness relied on for that purpose is insufficient for the purpose for which it is used. Such knowledge as hers must be distinguished from

the case where a copy is proved by the testimony of one who compared it with the original record, and one that was read by another. In such case, the copy was preserved and clearly identified, and about that there was no uncertainty. Such was the case of *Gyles* v. *Hill*, 1 Camp. 471. In that case "an examined copy of the will was offered in evidence. The witness producing it swore that he received it from the clerk of the office, who read the original while the witness examined the copy." Upon objection, this was held sufficient by Lawrence, J., who said : "Here the original was read by the officer of the court, but I should have ruled the same way had it been read by any other person." Citing *McNeil* v. *Pritchard*, 1 Esp. Cas. 263. "A copy delivered out by a person appointed by the law for that purpose is evidence, without any proof of its being examined."

The case of *Morris* v. *Swaney*, 7 Heis. 591, was a proceeding to set up a will lost before probate. The case was tried by a jury, who found for the will. It was a case of alleged suppression of a will by the heirs at law, after the death of the testator, and while the residence was entirely in their possession. The evidence showed that the tract of land was purchased for a woman, and the illegitimate children of the testator; that they were put in possession by the testator ; and that the will was made and duly executed by the testator, and properly attested. The evidence of several witnesses proved the contents of the will, from having seen and heard it read, and from the declarations of the testator. The court held such evidence clearly admissible; but it was a case of much conflict of testimony. The court said : "The question as to the credibility of witnesses is peculiarly one for a jury. The question is whether the verdict is sufficiently sustained by the evidence. In many of the cases in our court upon this subject it has been said that this court will not reverse upon the facts, if there is

evidence; in some, it is said, if there is *any* evidence to support the verdict;" and that the facts in that record do not greatly preponderate against the verdict." The court cited and adopted the following from 1 Redf. Wills, 2, 8: "The result of all the American authorities seems to be that lost wills may be established by the same kind of evidence as other lost testaments: 1. By a copy; 2. By proof of its contents from memory and recollection." Mr. Redfield further says: "Yet, in practice, *so much severity of scrutiny is exercised* that very few lost wills are established, unless there is reason to believe that they are purposely suppressed."

This language is cited in the case of *Morris* v. *Swaney, supra,* with the words in italics, "*so much severity of scrutiny is exercised,*" omitted; remarking further: "There is no doubt that the knowledge of a witness who only hears a paper read is not of as high a character as that of a witness who reads for himself, for the witness who hears it read cannot know that it is correctly read to him. Still his evidence must be admissible; how satisfactory it will be depends upon other circumstances," and expressly in that case, saying: "And here again we repeat that we express no opinion as to what would be our conclusion were it our duty to determine from this evidence whether the complainants have fully and clearly made out their case. There are cases that hold that the contents of the will could not be established except upon the evidence of those who have seen and read it, and that the declarations of the decedent, or the professed reading of the decedent, are not even admissible, except as corroborative of more direct evidence." *Chisholm* v. *Ben,* 7 B. Mon. 408, and cases cited.

But, for reasons already stated, we think such evidence is admissible where it is the best evidence the nature of the case will admit of. But it does not follow that any and every degree of proof will be sufficient. In this case it is sought to

overturn (in effect) an ancient and unquestioned possession and title, so long as the records were in a state of preservation, by evidence of the degree of estate held by the grantor in the deed of the appellant, brought forward only after destruction of the record, dependent on the recollection of a child as to what she heard 68 years before, read by a non-professional. It is not clear that this person could have described accurately the degree of this estate the next day after she heard it read, and it is improbable that her unaided recollection could, after so many years, enable her to prove whether the contingence she speaks of was the birth of issue or the survival of issue. Titles should not be disturbed, and possession overturned, upon evidence so altogether unreliable and questionable.

We think the circuit court erred in the decree of October term, 1883, setting up this will, and the same will be reversed and a decree entered here dismissing the petition of the plaintiffs.

DECREE REVERSED.